UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JEANNE R. MATOS,

                          Plaintiff,                          04 CV 768 (SJ)

        - against -                                    <u>MEMORANDUM</u>
                                                       <u>AND ORDER</u>
MTA BRIDGES AND TUNNELS (LEGAL NAME,
TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY),

                          Defendants.
------------------------------------------------------------X
A P P E A R A N C E S:

MICHAEL G. O'NEILL
30 Vesey Street, Third Floor.
New York, New York 10007
By:    Michael G. O'Neill, Esq.
Attorney for Plaintiff

STEVE S. EFRON.
237 West 35th St. Ste. 1502
New York, New York 10001
By:    Steven S. Efron, Esq.
Attorney for Defendant


JOHNSON, Senior District Judge:


        Plaintiff, Jeanne R. Matos ("Plaintiff" or "Matos") brings this action against

Defendant MTA Bridges and Tunnels (legally named, Triborough Bridge and Tunnel

Authority) ("TBTA" or "Defendant") alleging violations of the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"); the New York State Human

P-049

Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code art. 8 (the "NYCHRL"). Currently before this Court is Defendant's motion for summary judgment. For the reasons stated herein, the motion is DENIED.

## FACTUAL BACKGROUND

In August 1985, Plaintiff suffered a severe brachial plexus injury in an automobile accident. Deposition of Jeanne R. Matos ("Pl. Dep.") p. 75. In spite of Plaintiff's injury, she is capable of holding, carrying and lifting objects. Id. at 75. Plaintiff's only limitation with regard to the objects she carries with her impaired arm is that the object is not to exceed fifty pounds. Id. at 76. Plaintiff is "self sufficient and able to dress and take care of herself without assistance. She is able to cook, use the computer, play racquetball and enjoys doing crafts. Pl.'s Mem. Of Law in Opp'n. ("Pl. Mem.") at 6.

In January 2003, plaintiff applied for a "Temporary Bridge and Tunnel Officer" ("TBTO") position. Id. TBTOs are temporary toll collector positions whose employment lasts for a term of one year. Id. Plaintiff was accepted for the position and after she attended an orientation session, she was instructed to return on March 5, 2003 to begin a three-day paid training course. Def. Mem. of Law in Supp. of Summ. J. ("Def. Mem.") at 4. Matos arrived at the training with her arm in a sling, as she had at the earlier orientation session. Pl. Mem. at 7. After the training session began, one of the TBTA trainers asked Matos when she expected to no longer require use of the sling. Id.

Matos informed the trainer that due to the nature of her injury, the sling was permanent. Id. At that point, the TBTA trainer instructed Matos to report to Human Resources. Id. At Human Resources, Plaintiff spoke with Brandon Stratford, Defendant's Manager of Employee Services. Mr. Stratford informed Plaintiff that she would not be permitted to continue with training because she was considered a "safety risk." Pl. Dep., at 32. Mr. Stratford informed Plaintiff that in order to work as a TBTO she would need the full use of both arms. Def. Mem. at 4. Evidently, both arms are required so that TBTOs can hold a cash drawer in one hand and stop traffic at the toll plaza with the other hand. Pl. Mem. at 7.

Plaintiff suggested that she be permitted to carry her cash drawer in a bag but Mr. Stratford replied, "we can't do that." Pl. Dep. at 33. Plaintiff then suggested the use of an escort, wherein another officer could stop the traffic for her as she crossed the toll lanes, but Mr. Stratford replied again in the negative stating "that's not [the officer's] job." Id. at 34. Mr. Stratford then asked plaintiff to sign a letter of resignation in exchange for $80 in compensation for attending the first day of training. Plaintiff refused to sign the form and she was sent home. Id. at 35-37.

Plaintiff's husband placed a call to the TBTA later that day and requested to see a copy of the TBTA Equal Employment Opportunity ("EEO") policy. Id. at 38-40. Shortly thereafter, Defendant contacted Plaintiff and told her to report for an examination by Dr. Robert Nadig but did not agree to give Plaintiff a copy of the EEO policy. Id. at 40-41.

Dr. Nadig is an occupational therapist who has been on retainer with the TBTA for several years. Nadig Dep. at 12. In addition to evaluating employees sent to him by the TBTA, Dr. Nadig also refers some of the work he receives from the TBTA to other physicians on a subcontract basis. Id. at 16-17. Dr. Nadig, who stated in his deposition that he receives a "substantial amount of money" from the TBTA every year, has never cleared an individual with a disability as fit for the TBTO position. Id. at 15.

On March 12, 2003, Dr. Nadig examined plaintiff for approximately 10 - 15 minutes, the first ten minutes of which were spent in a discussion regarding the nature of the injury to Plaintiff's arm. Pl. Dep. at 44. In the course of his examination, Dr. Nadig failed to asked Plaintiff about any limitations stemming from the injury to her arm however, neither did he evaluate Plaintiff's ability to carry objects in her right arm. Pl. Dep. at 45; Pl. Mem. at 8. During his deposition, Dr. Nadig indicated that he did not perform any quantitative tests or analysis to determine whether the accommodations that plaintiff suggested were in fact reasonable. Nadig Dep., at 47-48. As noted in Plaintiff's Memo in Opposition and in Dr. Nadig's deposition transcript, the doctor was misinformed as to the basic functions of the TBTOs and believed that their duty was to relieve regular Bridge Tunnel Officers ("BTOs") for lunch and other breaks.[1] Pl. Mem. at 8. Evidently, this incorrect understanding of the nature of the TBTO position helped to frame Dr. Nadig's evaluation of Plaintiff's abilities and left him with the incorrect

---

[1] TBTOs are in fact hired to replace regular BTOs who are out on pre-planned absences including vacations, leaves of absence, etc. Ferrara Dep. at 14-15. The TBTA has a regularly scheduled relief position that it uses to cover BTOs on their lunch and other breaks. Id. at 21.

P-049

impression that Plaintiff would have to change toll booths between 10 and 20 times per shift. Id. at 8; Nadig Dep. at 48.

Despite the fact that he neither evaluated plaintiff's ability to make change nor assessed her ability to collect tolls, Dr. Nadig's report concluded that Plaintiff would need "significant accommodations," at a minimum in order to work as a TBTO. Nadig Report, p 2. In addition to an escort who could help Plaintiff navigate through traffic, Dr. Nadig stated that Plaintiff would need a productivity accommodation because she would be performing with only one arm, tasks that are usually performed with two, which would slow traffic in her lane. Id. Dr. Nadig also stated that Plaintiff would not be able to stand for long periods of time, even with the help of a sling which could preclude overtime shifts and might require a shift shorter than 8 hours. Id. Dr. Nadig later acknowledged in his deposition testimony that toll collectors have stools in the toll booths so that they do not have to stand for eight straight hours. Nadig Dep. at 50. Nevertheless, he determined that "[t]he above accommodations would typically be considered not reasonable." Nadig Report, p 2.

Plaintiff was then contacted by Gloria Colon, Defendant's Chief Employment Opportunity Officer, with whom she met on March 17, 2003. Pl. Mem. at 9. Plaintiff restated her requests for an accommodation, specifically that she be allowed to carry her cash drawer in a bag or that she be escorted to a toll booth. Id. Ms. Colon denied both of those requests on the grounds that "legally we are not required to do that." Colon Dep. at 37. Ms. Colon stated that she had not conducted any analysis as to the cost of

P-049

providing an escort to a toll both, nor could she state whether providing an escort would be a hardship for Defendant. Colon Dep. at 39-40. When questioned further as to why Plaintiff could not use a bag to carry her cash drawer, Ms. Colon stated that Plaintiff could not do so because Ms. Colon "found that that was not appropriate" and "felt that it was scary." Colon Dep. at 42.

On March 24, 2003, Ms. Colon wrote to Plaintiff informing her that Defendant would not offer her a TBTO position. Pl. Mem. at 11. Neither Mr. Stratford, Dr. Nadig, nor Ms. Colon conducted any analysis to determine how many toll booth transactions Plaintiff could perform per hour; neither did they test her ability to make change or collect tolls. Pl. Mem. at 7-11.

On February 24, 2004, Plaintiff filed the instant complaint. Defendant filed the instant summary judgment motion.

## DISCUSSION

### I. Summary Judgment Standard

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the movant to establish the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323; see also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

P-049

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citation omitted). When considering motions for summary judgment, the courts are not to resolve the contested issues of fact, but rather they are to determine whether or not any disputed issue of material fact exists. See, e.g., Donahue v. Windsor Locks Bd. Of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

Once the movant has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to present "significantly probative" supporting evidence showing that there is a material factual issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. 317 at 322; see also Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 469 (2d Cir. 1999). According to the Second Circuit, when the case at bar is grounded in a claim of discrimination, special care should be taken in assessing summary judgment motions.

> "[W]hen deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination." <u>Gallo</u> at 1224; <u>See also</u> <u>Chertkova v. Connecticut General Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir 1996) ("[T]rial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue.")

## II.  The Americans with Disabilities Act

According to the ADA, no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees. . . ." 42 U.S.C. §12112(a).  In order to make out a prima facie case against an employer, a plaintiff must show that: 1) his employer is subject to the ADA; 2) he was disabled within in the meaning of the ADA; 3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and 4) he suffered adverse employment action because of his disability. <u>Heyman v. Queens Village Comm. For Mental Health</u> 198 F.3d 68, 72 (2d Cir. 1998).  For the purposes of the Act, the term "discriminate" means in relevant part:

> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, *unless* such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical

P-049

or mental impairments of the employee or applicant. Id. § 12112(b)(5) (emphasis added).

The Act defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). As it pertains to determining which are the "essential functions" of the employment position in question, the Act states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." Id. The Act describes "undue hardship," as "an action requiring significant difficulty or expense." Id. § 12111(10).

While the Act offers these provisions as guidance, "they do not provide clear answers to the litigation issues that arise in lawsuits claiming discrimination on the basis of disability." Borkowski v. Valley Central School District, 63 F.3d 131, 145 (2d Cir. 1995). The court then provided a framework for assessing these factors in the context of employment discrimination.

In the Second Circuit, the plaintiff "bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question" either with or without an accommodation. Id. at 138. If the plaintiff claims qualification with an accommodation, the plaintiff must demonstrate that the accommodation is

reasonable. "This burden," the court wrote, "is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Id. at 138.

According to the court, once the plaintiff establishes this, "she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." Id. at 138 (*citing* Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991). Upon establishing a plausibly acceptable accommodation, the burden shifts to defendant to show that the accommodation is unreasonable. Borkowski at 138. The employer's burden is to engage in a cost/benefit analysis to demonstrate the unreasonableness of the suggested accommodation. Id. If defendant fails to carry that burden, the court can find that it discriminated on the basis of disability. Borkowsi, at 138. "The plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits. These two requirements placed on the plaintiff will permit district courts to grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." Id. at 139. The court further noted that it did not "intend to suggest that employers…must analyze the costs and benefits of proposed accommodations with mathematical precision…a common-sense balancing of the costs and benefits in light of the factors…is all that is expected." Id. at 140.

P-049

## III. Plaintiff's Claim

It is under the framework provided by these standards, that this Court must analyze Plaintiff's claim. The TBTA does not dispute for purposes of the instant motion that it is subject to the ADA. Def. Mem. at 9. The TBTA concedes that Plaintiff's medical condition satisfies the ADA's definition of disability and that its refusal to hire her was an adverse employment action. Def. Mem. at 9. However, the TBTA argues Plaintiff was not "otherwise qualified to perform the essential functions of [her] job with or without a reasonable accommodation." Heyman 198 F.3d. 68, 72. The TBTA posits two reasons as to why Plaintiff was incapable of performing the essential functions of a toll collector: 1) Matos would not be capable of meeting the TBTA performance standard and 2) Matos' presumed inability to hold a cash bank weighing roughly nineteen pounds in one arm while using her other arm to stop traffic as she traversed toll booth lanes, posed an inexcusable safety risk. It is for these reasons that the TBTA argues its decision to not hire her was not disability discrimination. Defendant also argues that Plaintiff's state claims are baseless and moves for dismissal of those claims as well. Each argument is addressed in turn below.

### A. Essential Functions of the TBTO Position

As noted *supra* in order to make out a prima facie case against an employer under the ADA, a plaintiff must show that: 1) his employer is subject to the ADA; 2) he was disabled within in the meaning of the ADA; 3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation;

and 4) he suffered adverse employment action because of his disability. <u>Heyman</u> 198 F.3d 68, 72. As noted, only the third element of the four part test is disputed. Def. Mem. at 9. The term "qualified" is not unambiguous on its face but the meaning of the term in the context of employment discrimination is clear: "an individual is otherwise qualified for a job if she is able to perform the essential functions of that job either with or without a reasonable accommodation." <u>Borkowski</u> at 135. In determining which functions of the employment position in question are indeed "essential," the EEOC regulations define them as the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" <u>Stone v. City of Mount Vernon</u>, 118 F.3d 92, 97 (2d Cir. 1997) (*internal citations omitted*).

According to the ADA, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The job description for the TBTO reads "[t]he principal function of Temporary Bridge and Tunnel Officers involves the collection of tolls." Efron Decl. Ex. 2. Since "the TBTA's mission is to 'move traffic expeditiously,' it necessarily follows that the TBTA expects its toll collectors to handle cash transactions expeditiously." Def. Mem. at 10. This definition is stated in the TBTA toll training manual and in the orientation session acknowledgement signed by Plaintiff. <u>Id</u>. at 11.

According to Defendant, the TBTA examines cash transaction data at its facilities in order to derive a baseline performance standard for the toll collectors. <u>Id</u>. at

P-049

11. This "baseline performance standard" is used for personnel hiring and staffing of cash toll lanes. Defendant cites transaction data for the Verrazano-Narrows Bridge which shows that "toll collectors are capable of processing *on average*, 223 vehicles an hour" (emphasis added). Id. Defendant claims that Plaintiff, "working with one arm in a job requiring bimanual dexterity, would fall far short of meeting the TBTA's performance standard for toll collectors." Id. Defendant argues that an accommodation that overlooked Plaintiff's supposed inability to meet performance standards "would in effect excuse Matos from performing an essential function of the toll collector job, the expeditious movement of traffic through her toll lane." Id. at 12. As support for its claim, Defendant states "[c]ourts addressing the issue have held explicitly that the ADA does not compel an employer to disregard or relax its performance, or productivity, standards as an accommodation to a disabled job applicant..." Id. at 13.

Under the facts as presented however, it is difficult to see how the TBTA can maintain its argument that this vehicle per hour average serves as a quantifiable performance standard. The TBTA asserts that the 223 vehicles per hour average is an established standard of performance for the Verrazano Bridge, however there is no mention of a 223 vehicle per hour standard – or *any other numerical measure* of performance for TBTOs in Defendant's description of the position. When asked in Plaintiff's interrogatories to state whether it had any productivity standards for Bridge and Tunnel officers (either permanent or temporary workers), Defendant could not identify any and instead referred Matos to various publications. None of those

P-049

publications listed any specific performance standard. Pl. Mem. at 13. Significantly, the document which first cites this 223 hour average was not created until 2004. Plaintiff's Mem. At 26. Plaintiff was dismissed from the position in 2003. Therefore, the 223 average could not have been used as part of the evaluative process for Plaintiff. Additionally, the 223 vehicle per hour average is the average for the Verrazano Bridge only. Defendant has a number of facilities, several of which operate on a lower vehicle per hour average for staffing at other facilities. Pl. Mem. at 27. Most importantly however, it is difficult to see how the *average* of 223 vehicles per hour rate can be used as an actual productivity standard since Defendant *does not measure the productivity of individual TBTOs*. Pl. Mem. at 26. In fact, Defendant has *never* disciplined or terminated toll booth collectors for productivity reasons. Ferrara Dep. p. 9-10. Although Defendant argues that it uses data collected at its facilities to derive a baseline performance standard for the toll collectors, there does not appear to be any point at which the TBTOs are tested to see if they can meet this standard. Indeed, the 223 vehicle per hour rate appears to be merely an average of the number of automobiles passing through only one of Defendant's facilities and not a measure of TBTO ability.

Based on Defendant's assessment of Plaintiff's abilities, Plaintiff is capable of processing between 60 – 66 percent of the rate of 223 vehicles per hour of non-disabled operators at the Verrazano's Bridge.[2] However, the staffing analysis of each facility

---

[2] This Court issues no opinion as to the reliability of Defendant's analysis of Plaintiff's abilities. However, it is important to note that the tests performed on the Plaintiff "require the continuous and simultaneous use of both hands throughout the duration of the tests." Pl. Mem. at 16. As noted by Plaintiff, "making change is only one part of the process of passing through the toll. There are numerous

uses a rate different from that of 223 vehicles per hour and, based on Defendant's own numbers, there are several facilities and shifts for which Plaintiff's abilities are a match including the Cross Bay Bridge and Marine Parkway Bridge. Pl. Mem. at 19-20.

Under these facts, contrary to Defendant's assertions, it is not clear that Plaintiff would be unable to perform at the same or similar rate as other toll collectors. Accordingly, a reasonable jury could find that Plaintiff could indeed meet any such performance standard.

### B. Plaintiff's Impairment Posed a Safety Risk

Defendant's initial objection to Plaintiff's employ as a TBTO, was that such an employment position was a "safety risk." Defendant argues that the "TBTA had a right, in assessing...the safety risk posed to Matos herself in traversing active toll lanes without adequate means to stop traffic." Id. at 16. The TBTA issues safety instructions that set forth the following mandatory procedure:

> "The purpose of this policy is to establish a safe method for all personnel crossing a TBTA toll plaza, when reporting to and from work assignments or the service building.... Clearly signal your intention to each motorist before you cross a toll lane roadway, and upon reaching your destination. A motorist should be stopped by means of a hand signal (arm straight out with palm facing motorist). You must make certain the motorist understands your intention by making eye contact with him/her." Id. at 15.

---

things that happen in the process that do not require any action at all on the part of the toll booth operator. The car that just paid the toll takes time to pull out of the toll plaza and the next car in line takes time to pull up to the toll booth." Id. Plaintiff calls into question the underlying basis of Defendant's methodology in calculating this percentage and will have the opportunity to address these arguments at trial.

P-049

As noted *supra*, the toll collector must at the same time "carry with the other arm the equipment and funds, weighing some nineteen pounds needed to perform the duties of a toll collector. Colon Dep. at 26-27. On the first day of Plaintiff's orientation, Defendant's Manager of Employment Services, Brandon Stratford, informed her that, due to her impairment, she would not be allowed to continue training. In his deposition testimony, Mr. Stratford stated the following:

> "I told her without having full use of both arms...I could not allow her to continue in the training...I explained why and that predominantly *more than anything else* was because for [Matos'] own safety and you need to be able to navigate across the toll plaza where there is moving traffic. . . .I demonstrated for her, you need to get eye contact with the motorist and make sure they see you and then put an arm out with the hand [indicating]...to make sure they can see you and then stop them so you can cross. And while you are doing this you're holding your money bag, your money tray, whatever notes, whatever else you need to carry along with that...and it is essential you have this hand out for your *own safety and to save your life* and without being able to do that, it is very risky. . . .It would be a safety risk for herself, can endanger other motorists." (emphasis added) Stratford Dep. at 14-15.

The danger accompanying Matos' presumed inability to navigate the toll lanes while simultaneously holding a money tray, was a rationale reiterated by nearly all of the affidavits submitted by Defendant's representatives. Martha Walther, Defendant's Vice President of Operations, cited her concerns for Plaintiff's safety and the need for an escort to assist her getting to and from a toll booth. She stated "toll plazas are very busy and dangerous." Walther Aff., ¶¶ 8-14. Bridge and Tunnel Sergeant John Gaudet referenced the need to "take every precaution to safely cross and work in and about the

P-049

toll lanes." Gaudet Aff., ¶ 7.  Defendant's Director of Human Resources and Training stated her "concern for Ms. Matos' safety, and the safety of co-workers and motorist regarding her wearing a sling when crossing toll plaza traffic lanes." Schroth Aff., ¶ 9.[3]

In response to Defendant's stated concerns for Plaintiff's safety, Plaintiff suggested two possible accommodations: 1) Plaintiff suggested that she be allowed to carry the money tray in a bag or 2) that an escort be assigned to help her cross toll lanes. In response to the first accommodation suggestion of carrying the money tray in a bag, as noted *supra*, Mr. Stratford informed Plaintiff "we can't do that." Pl. Dep. p 32-34. When Plaintiff inquired as to the possibility of having an escort, Mr. Stratford stated "that's not [the officer's] job." Id.

Defendant's Chief Equal Employment Opportunity Officer, Ms. Colon, repeated Mr. Stratford's reasons for not accommodating Plaintiff. When asked in her deposition testimony why providing an escort was not a reasonable accommodation, Ms. Colon indicated that the TBTA concluded that it "could not" provide Plaintiff an escort. Colon Dep. at 37. When probed further regarding the reasons why it could not do so, Ms. Colon stated "[w]e don't' have to.  Legally we are not required to do that." Id. Most importantly, Ms. Colon also conceded that she did not perform an analysis as to the cost of providing Plaintiff with an escort, nor could she state whether or not providing an escort would present a hardship, economic or otherwise, on the TBTA. Id. at 38-41.  As noted *supra*, Ms. Colon's response to Plaintiff's accommodation request

---

[3] It is important to note that none of these employees listed any concerns with Plaintiff's perceived lack of productivity in their rational for Defendant's adverse hiring decision.

P-049

to carry the money tray in a bag, was that Ms. Colon found the suggestion "inappropriate" and "scary." Id. at 42.

Indeed, Defendant reiterated its concerns for Plaintiff's ability to safely navigate the toll lanes in its response to Plaintiff's interrogatories. In Plaintiff's initial written discovery demands dated June 24, 2004, Interrogatory 6 read as follows: "State the amount in whole dollars TBTA would have been required to pay to meet each of plaintiff's accommodation requests and explain how such calculation was made." Pl. Mem. at 12. The TBTA responded by stating: "The issue was the safety of the plaintiff, her co-workers and the motoring public." Id. at 13.

Under the Borkowski analysis, Plaintiff has clearly met the burden of demonstrating that her accommodation suggestions were reasonable and/or plausible. Carrying a money tray in a bag with a shoulder strap appears to be a facially reasonable accommodation to Defendant's concerns for Plaintiff's ability to carry a money tray. Similarly, crossing the toll lanes with an escort appears to be a reasonable, or at least plausible, accommodation to address Defendant's concerns for Plaintiff's safety. Thus, Plaintiff has indeed made out a prima facie showing that the accommodations suggested are reasonable. The burden now shifts to Defendant to "engage in a cost/benefit analysis to demonstrate the unreasonableness of the suggested accommodation. Borkowski at 138.

As reiterated throughout Ms. Colon's deposition testimony however, Defendant presents no plausible evidence whatsoever as to why carrying the money tray in a bag

or walking Plaintiff to her post with an escort are accommodations, the costs of which exceeds their benefits. Defendant made no attempt to engage in any cost/benefit analysis to determine the reasonableness of supplying an escort and relied instead on its opinion that it "did not have to" as sufficient grounds for denying the accommodation request.

In fact, Defendant's own "Rules and Regulations" indicate the use of bags for toll collectors. Toll collectors "shall count his bills, sort his tickets…and enclose same…in the deposit bag and have deposits verified by the Lieutenant or Sergeant before locking and depositing his bag." Ex. G, Triborough Bridge and Tunnel Authority Rules and Regulations, at 15. Thus, Defendant has failed to meet its burden with regard to this accommodation suggestion.

As it pertains to Plaintiff's second accommodation suggestion – that she have an escort accompany her to and from her assigned traffic lane – Defendant similarly fails to meet its burden. Defendant argues it was not required by law to provide an escort. While this Court expresses no opinion at this time as to whether or not that assertion is correct, Defendant failed in its requirement to present even a modicum of analysis as to the hardship this accommodation request would present. Far from engaging in any form of cost benefit assessment, as early as the day Plaintiff was initially sent home from her training session, she was informed by Defendant that it would not provide her with an escort because that was "not their job." Stratford Dep. at 16.

P-049

As noted by the Second Circuit in Borkowski, "there is nothing inherently unreasonable or undue in the burden that an employer would assume by providing an assistant to an employee with disabilities; the regulations clearly contemplate, and courts have held, that employers may be required to assume the cost of providing assistants for otherwise qualified individuals with disabilities absent a showing by the employer that the cost is excessive in light of the factors enumerated in the regulations." Borkowski at 142; See also, 42 U.S.C. §12111(9)(B) (a reasonable accommodation may include "the provision of qualified readers or interpreters and other similar accommodations.") A motion for summary judgment can be entered on this issue only if the Defendant "has demonstrated, as a matter of law, that the accommodation is unreasonable or that it imposes an undue hardship." Id. at 142. As Defendant fails to meet its burden in this regard, its arguments to the contrary must fail.

## C. Defendant's State Law Claims

In its attack on Plaintiff's state law claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §296 and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code art 8, Defendant argues that the state claims should fail on the basis of the same arguments posited against Matos' federal claims. This Court disagrees. Similar to the ADA, the NYSHRL and the NYCHRL require that plaintiff demonstrate the ability to perform the essential functions of the job in question with or without reasonable accommodation. Shannon v. New York City Tr. Auth, 332

F.3d 95, 104-04 (2d Cir. 2003). As stated *supra*, Plaintiff has more than adequately met her burden under the ADA and this Court finds that she also satisfies the requirements under the NYSHRL and the NYCHRL.

Defendant also argues that the TBTA is not subject to the NYCHRL. As the TBTA is a subsidiary or affiliate of the Metropolitan Transportation Authority ("MTA"), Defendant claims that pursuant to N.Y. Public Authorities Law § 1266(8), the TBTA is exempt from local laws like the NYCHRL. §1266(8) reads in relevant part:

> "[N]o municipality or political subdivision, including but not limited to a county, city, village, town or school or other district shall have jurisdiction over any facilities of the [metropolitan transportation] authority and its subsidiaries, and New York City transit authority and its subsidiaries, or any of their activities or operations."

Despite Defendant's claims to the contrary, "courts that have considered the issue in a more nuanced fashion have rejected [Defendant's] position." Kemp v. Metro North, 2007 U.S. Dist. LEXIS 43568 (S.D.N.Y. June 27, 2007). As noted in Everson v. N.Y. City Transit Authority, the New York Court of Appeals recognized that while public authorities were "independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission," that autonomy was not unlimited. 216 F. Supp. 2d 71, 80 (E.D.N.Y. 2002).

The autonomy enjoyed by the TBTA and its umbrella organization, the MTA, exists only to the extent that it "should be free from requirements imposed on other

P-049

State agencies that would interfere with the accomplishment of the public corporation's purpose." Id. at 80. The court went on to hold that since prohibitions against discrimination were not contrary to the Authority's purpose, which is to "acquire and operate transit facilities," a prohibition against employment discrimination "would not interfere with the [Authority's] function and purpose." Id. Thus, the Authority was indeed subject to the human rights provisions of the Administrative Code. Id. As stated in Kemp, the TBTA "is not immune from the reach of the NYCHRL insofar as the law is not inconsistent with any New York State law. Defendant has not identified any way in which the NYCHRL conflicts with state law. Accordingly, [the TBTA] is not exempted from the requirements of the NYCHRL." Kemp at 39. Therefore, Defendant's claims to the contrary, fail.

P-049

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is

DENIED.

SO ORDERED.
DATED: March 27, 2008
          Brooklyn, New York

s/b Judge Johnson

Senior U.S.D.J.